ERIC A. GROVER (SBN 136080)
eagrover@kellergrover.com
CAREY G. BEEN (SBN 240996)
cbeen@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, California  94103
Telephone:     (415) 543-1305
Facsimile:     (415) 543-7861


Jeremiah Frei-Pearson (*Pro Hac Vice*)
D. Greg Blankinship (*Pro Hac Vice*)
**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
1311 Mamaroneck Avenue
White Plains, New York 10605
Telephone:  (914) 298-3281
Fax:  (914) 824-1561
jfrei-pearson@fbfglaw.com
gblankinship@fbfglaw.com


*Counsel for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN FALKENBERG and STEVEN INGARGIOLA, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs<br><br>　　　　　　　v.<br><br>ALERE HOME MONITORING, Inc.,<br><br>　　　　　　　Defendant. | CASE NO. 13-cv-00341-JST<br><br>**FIRST AMENDED<br>CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>**<br><br>COMPLAINT FILED:  January 24, 2013 |

Plaintiffs John Falkenberg and Steven Ingargiola, by their undersigned attorneys, as and for their class action complaint, allege, with personal knowledge as to their own actions, and upon information and belief as to those of others, as follows:

## NATURE OF THE ACTION

1. This class action seeks to redress Defendant Alere Home Monitoring, Inc.'s ("Alere" or "Defendant") unlawful negligent maintenance and disclosure of confidential personal and medical information it obtained from approximately 116,000 patients, in violation of California's Confidentiality of Medical Information Act ("CMIA"), Civil Code Section 56, *et seq.*, California's Business & Professional Code Section 17200, *et. seq.*, the Federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et. seq.*, and common law.

2. Defendant Alere assists physicians and insurance companies in tracking the medical care provided to over 450,000 patients who live at home with medical conditions that require significant home-monitoring. As a result, Alere collects and stores confidential personal and medical information from those patients. Alere maintains copies of that information at its facilities in California.

3. California and federal law requires that medical service providers, such as Defendant, must securely maintain the confidentiality of their patients' medical information and the law prohibits the disclosure of such information without patients' written authorization. In recognition if its obligations, Defendant represents on its website that "Alere is committed to protecting your privacy. . . . We take reasonable precautions to keep your Personal Information secure. All personally identifiable information is subject to restricted access to prevent unauthorized access, modification or misuse."

4. Plaintiffs and the Class provided Alere with their highly confidential personal and medical information, including their names, addresses, dates of birth, Social Security numbers, and medical diagnosis codes ("confidential personal and medical information"). When patients provide their intimate information to Alere, they reasonably expect that their private medical information will be kept confidential and will not be disclosed to anyone without their authorization.

5. Unfortunately, Alere recklessly and negligently disregarded its obligations to safeguard patient confidentiality, the result of which was a massive, unauthorized disclosure of patients' confidential personal and medical information to criminals. On September 23, 2012, an Alere employee left a laptop in an inadequately secured vehicle in Fremont, California. This laptop,

which contained the confidential personal and medical information of approximately 116,000 patients, was subsequently stolen when thieves broke into the car.

6.     Not only did Alere fail to take reasonable precautions to prevent confidential personal and medical information from being stored on a laptop that was vulnerable to theft, but Alere failed to encrypt that data.  Encrypting confidential personal and medical information is the most basic of security precautions.

7.     As a result of Alere's failure to take basic security precautions, it appears that criminals have accessed the confidential information that Alere disclosed.   Indeed, victims of the data breach have suffered identify theft and other harms that likely result from the disclosure.   As alleged more fully below, both Carol Fertig, a member of the proposed Class and named Plaintiff Steven Ingargiola suffered identity theft likely as a result of their personal and confidential information being wrongfully disclosed by Alere.

8.     As a result of Alere's disclosure, criminals have likely accessed the personal and confidential information of over 116,000 individuals.  Criminals may use this information for their own illicit purposes at their leisure.  Given the volume of confidential and personal information, there will likely be many more instances of identity theft and other harms as a result of the disclosure.

9.     Thus, Alere's negligent and reckless maintenance of data resulted in the disclosure of the confidential personal and medical information of Plaintiffs and the Class.

10.     Notwithstanding its failure to protect confidential personal and medical information, Alere has done nothing to redress its gross misconduct, aside from offering only one year of credit monitoring, a time-period that is grossly insufficient to protect the victims of Defendant's unlawful actions from being further victimized by criminals who obtained their confidential personal and medical information.

## THE PARTIES

11.     Plaintiff John Falkenberg is a resident of Greenwich, New York, who requires medical home-monitoring.  Accordingly, Mr. Falkenberg has provided his most intimate confidential personal and medical information to Alere, with the reasonable expectation that Alere would protect the

confidentiality of that information.  Mr. Falkenberg has suffered emotional upset, risk of identity theft, risk of wrongful use of medical information, invasion of privacy, deprivation of the exclusive use and control of his personal and confidential information, and other harms as a result of the wrongful disclosure by Defendant.

12.    Plaintiff Steven Ingargiola is a resident of Freehold, New Jersey, who requires medical home monitoring.  Accordingly, Mr. Ingargiola has provided his most intimate confidential personal and medical information to Alere, with the reasonable expectation that Alere would protect the confidentiality of that information.  Mr. Ingargiola has suffered identity theft, emotional upset, risk of further identity theft, risk of wrongful use of medical information, invasion of privacy, deprivation of the exclusive use and control of his personal and confidential information, and other harms as a result of the wrongful disclosure by Defendant.

13.    Defendant Alere Home Monitoring, Inc. is a Delaware corporation with its principal place of business located at 6465 National Drive in Livermore, California.

### JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant; there are more than 100 Class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs bring claims pursuant to the federal Fair Credit Reporting Act.  *See* 15 U.S.C. § 1681 *et. seq*.

15.    Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred within this District and Defendant maintains its headquarters in this District.

## FACTUAL BACKGROUND

A.    **Plaintiffs Provided Their Highly Confidential**
      **Personal And Medical Information To Defendant.**

16.    Plaintiffs and Class Members have significant medical conditions that require at-home medical monitoring, which is facilitated by Alere.

17.    As part of this monitoring process, Plaintiffs provide their highly confidential personal and medical information to Alere.   To assuage patients' fear that this information will be unnecessarily disclosed to third parties, Alere's website boasts that "Alere is committed to protecting your personal privacy."   Alere promises that "[a]ll personally identifiable information is subject to restricted access to prevent unauthorized access, modification or misuse."

18.    Health care providers like Alere are required and expected to scrupulously maintain and safeguard the privacy of the confidential personal and medical information entrusted to them. Detailed instructions for maintaining the privacy of this information are set forth in numerous laws, including the federal Health Information Portability Accountability Act ("HIPAA"), the federal Health Information Technology for Economic and Clinical Health Act ("HITECH"), the CMIA, and other pertinent laws, regulations, and industry standards.

19.    Moreover, companies like Alere have abundant resources available to them to ensure the proper maintenance of Health Information Technology for Economic and Clinical Health Act. For example, security consultants can provide detailed guidance for how to best protect this information.   Sean Glynn, the vice president of the data security firm Credant Technologies, has opined that an armored car should be used to transport tapes containing volumes of confidential personal and/or medical information.

20.    Accordingly, Plaintiffs should have been able to expect that Alere would take the necessary precautions to safeguard and maintain their privacy.

**B.    Alere Disclosed Plaintiffs' Confidential Personal And Medical Information**

21.    Contrary to its obligations, Alere disclosed Plaintiffs' confidential personal and medical information.

22.    On November 20, 2012 Alere announced that a company-owned laptop containing individual information, including names, addresses, dates of birth, Social Security numbers, and diagnosis codes, was stolen from a vehicle owned by an Alere employee.   Notwithstanding its obligation to promptly inform patients that their confidential personal and medical information, Alere waited almost two months to inform patients of the theft.

**C.    The Disclosure Subjected Plaintiffs And
The Class To An Increased Risk Of Identity Theft.**

23.    Identity theft occurs when a person's confidential personal information, such as that person's name, Social Security number, or credit card number, is used without his/her permission to commit fraud or other crimes.   While some identity theft victims can resolve their problems quickly, the Federal Trade Commission ("FTC") reports that others spend hundreds of dollars and many days repairing damage to their good name and credit record.   Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports.   In rare cases, they may even be arrested for crimes they did not commit.

24.    According to the FTC, "the range of privacy-related harms is more expansive than economic or physical harm or unwarranted intrusions."   Accordingly, "any privacy framework should recognize additional harms that might arise from unanticipated uses of data."[1]   Furthermore, "there is significant evidence demonstrating that technological advances and the ability to combine disparate

---

[1] *Protecting Consumer Privacy in an Era of Rapid Change* FTC, Report March 2012
http://www.ftc.gov/os/2012/03/120326privacyreport.pdf.

pieces of data can lead to identification of a consumer, computer, or device even if the individual pieces of data do not constitute [personally identifying information]."[2]

25.     According to Javelin Strategy & Research 2012 Identity Theft Report, which quantifies the impact of data breaches on a nationwide basis, in 2011, the mean consumer cost of identity fraud was $354.  The same year, the average resolution time of identity fraud was 12 hours.  In 2011, the consumer cost for new account fraud and existing non-card fraud increased 33% and 50% respectively.  Consumers who received a data breach notification had a fraud incidence rate of 19% in 2011, while 43% of data breach victims reported their credit card numbers were stolen and 22% of the victims reported their debit card numbers were stolen.  More importantly, consumers who, like the victims of Alere's disclosure, were notified that their personal health information had been breached were 9.5 times more likely to experience fraud than consumers who did not receive a notification.

26.     Additionally, Defendant's potentially untimely notification substantially increased Plaintiffs' and Class Members' risk of "phishing" – an attempt by criminals to acquire information such as money, usernames, passwords, and credit card details from the victim by masquerading as a trustworthy entity through electronic communications.

27.     A criminal can easily identify the email address of a victim of the disclosure.  When a criminal has access to confidential personal information from a large group of similarly situated victims, it is much more feasible to develop a believable phishing spoof email that appears realistic and tailored to this specific group of victims. The fraudsters can then convince the group of victims to reveal additional private banking account and credit card information.

---

[2] 106 FTC, *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers*, *Preliminary FTC Staff Report*, 35-38 (Dec. 2010), *available at* http://www.ftc.gov/os/2010/12/101201privacyreport.pdf; *Comment of Center for Democracy & Technology*, cmt. #00469, at 3; *Comment of Statz, Inc.*, cmt. #00377, at 11-12.

28.     A person whose personal information has been compromised may not see any signs of identity theft for *years*.  According to the Government Accounting Office's June 2007 report on data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

29.     This delay of years demonstrates that the one-year of credit monitoring offered by Alere is woefully insufficient.  It is highly likely that, without additional relief from this Court, Plaintiffs and thousands of Class Members will be subjected to identity theft after the credit monitoring expires.

30.     Confidential personal and medical information is such a valuable commodity to identity thieves that they often trade it on the "cyber black-market" for a number of years.[3]   Identity thieves and other cyber criminals openly post information directly on various Internet websites, thereby making the information publicly available.  In one study, researchers found hundreds of websites displaying stolen personal and/or medical information.  The study concluded:

> It is clear from the current state of the credit card black-market that cyber criminals can operate much too easily on the Internet.  They are not afraid to put out their email addresses, in some cases phone numbers and other credentials in their advertisements.  It seems that the black market for cyber criminals is not underground at all.  In fact, it's very "in your face."[4]

---

[3] Indeed, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market. Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html. *See also* T. Soma, ET AL, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009).

[4] http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/

31.     On the black market, "health information is far more valuable than Social Security numbers," reported Dr. Deborah Peel, founder and chairwoman of Patient Privacy Rights.[5]   ABC News' searches found one seller offering database dumps for $14 to $25 per person.  ABC News was then sent, unsolicited, 40 individuals' private health information, including their names, addresses and body mass index.   Another inquiry yielded an offer of more than 100 records including everything from Social Security numbers to whether someone suffered from anxiety or hypertension, or even their HIV status.

32.     Thus, Defendant's disclosure of its patients' confidential personal and medical information has exposed those patients to a very high risk of identity theft.

33.     Moreover, every reasonable patient whose confidential personal and medical information has been disclosed to criminals suffers from emotional distress and anxiety, both because of the risk of identity theft and the highly private nature of medical information.

### D.     Criminals Likely Accessed The CMI That Alere Disclosed

34.     As a direct result of Alere's negligent failure to adequately protect the data it collected from patients, Defendant likely disclosed and released the confidential personal and medical information of Plaintiffs and the Class to criminals.

35.     Indeed, likely because of Alere's negligent disclosure, third party criminals accessed and viewed Plaintiffs' and the Class Members' CMI.

36.     Ms. Carol J. Fertig is a member of the Proposed Class and a resident of Fort Worth, Texas. Ms. Fertig is a patient who requires medical home monitoring.  During the relevant time period, Ms. Fertig provided her most intimate confidential personal and medical information to Alere, with the reasonable expectation that Alere would protect the confidentiality of that information.

---

[5]http://abcnews.go.com/Health/medical-records-private-abc-news-investigation/story?id=17228986&page=2#.UGRgtq7yBR4.

37.     Following the September 23, 2012 theft of the Alere computer containing Plaintiffs' and the Class Members' CMI, including Ms. Fertig's confidential and personal medical information, Ms. Fertig was subject to identity theft and the wrongful use and control of her personal and confidential information.  This identity theft and wrongful use of her personal and confidential information was likely a direct result of the wrongful disclosure by Defendant.

38.     Indeed, within weeks of the wrongful disclosure, on or about October 19, 2012, Ms. Fertig's CMI was utilized by criminals to open a fraudulent utilities account in Ms. Fertig's name with "Green Mountain Energy."

39.     In order to open the "Green Mountain Energy" account, the criminals were required to utilize Ms. Fertig's full name, date of birth and social security number, all of which was CMI Ms. Fertig had previously provided to Defendant (who subsequently wrongfully disclosed such information on or about September 23, 2012).

40.     Ms. Fertig has suffered identity theft, wrongful use of medication information, emotional distress, invasion of privacy, deprivation of the exclusive use and control of her personal and confidential information, and other harms likely as a direct result of the wrongful disclosure by Defendant.

41.     Indeed, Ms. Fertig was required to expend numerous hours working with local authorities, debt collection agencies and "Green Mountain Energy" in order to address the $900 debt for services improperly rendered in her name as a result of the aforementioned identity theft and wrongful use of her personal and confidential information.

42.     Notably, this was the first instance of identity theft Ms. Fertig was ever subject to in her lifetime.

43.     Ms. Fertig has always taken extra precautions to ensure that her personal and confidential information was not disclosed to unknown third parties.  Accordingly, prior to

Defendant's wrongful disclosure, Ms. Fertig personal and confidential information was never compromised or utilized by an unknown third party.

44.     Like Ms. Fertig, named Plaintiff, Steven Ingargiola, has also been subject to identity theft that likely resulted from Defendant's wrongful disclosure.

45.     Following the September 23, 2012 theft of the Alere computer containing Plaintiffs' and the Class Members' CMI, including Mr. Ingargiola's confidential and personal medical information, Mr. Ingargiola was subject to identity theft and the wrongful use and control of his personal and confidential information.   This identity theft and wrongful use of his personal and confidential information was likely a direct result of the wrongful disclosure by Defendant.

46.     Indeed, within weeks to months of the wrongful disclosure, Mr. Ingargiola's CMI was utilized by thieves to open a fraudulent account in Mr. Ingargiola's name.

47.     In or about August of 2014, Mr. Ingargiola was contacted by a debt collection seeking to recover for a debt that was fraudulently incurred in Mr. Ingargiola's name.   The debt collection agency informed Mr. Ingargiola that the account had been opened in his name and with his social security number.

48.     Notably, this was the first instance of identity theft Mr. Ingargiola was ever subject to in his lifetime.

49.     Mr. Ingargiola has always taken extra precautions to ensure that his personal and confidential information was not disclosed to unknown third parties.   Accordingly, prior to Defendant's wrongful disclosure, Mr. Ingargiola personal and confidential information was never compromised nor utilized by an unknown third party.

## CLASS ACTION ALLEGATIONS

50.     Plaintiffs bring this action on their own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of:

All persons whose confidential personal and medical information was contained on the laptop stolen from an Alere employee's vehicle in September, 2012. Excluded from the Class are Defendant, any entity in which any Defendant has a controlling interest, Defendant's officers, directors, agents, employees and legal representatives, the Court and Court personnel.

51.     This action is brought as a class action for the following reasons:

a.      The Class consists of approximately 116,000 persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.      There are questions of law or fact common to the Class which predominate over any questions affecting only individual members, including:

i.      Whether Defendant disclosed the confidential personal and medical information of Plaintiffs and the Class, without authorization;

ii.     Whether such conduct constitutes a violation of California Civil Code §56, *et seq.*; and

iii.    Whether Defendant violated the FCRA;

c.      The claims asserted by Plaintiffs are typical of the claims of the members of the Class because the rights of Plaintiffs and Class Members were violated in a virtually identical manner as a result of Defendant's wrongful actions and/or inaction that caused the unauthorized disclosure of Plaintiffs' and Class Members' confidential personal and medical information;

d.      Plaintiffs, who have no interests which are antagonistic to the claims of the class, will fairly and adequately protect the interests of the Class, and Plaintiffs have retained attorneys experienced in consumer, data breach, and invasion of privacy class action litigation, and who have successfully represented plaintiffs in complex class actions.

Plaintiffs' counsel currently represents other plaintiffs in similar complex class action litigation involving wrongful disclosures and access of private information;

e.       Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

f.       Defendant has acted on grounds that apply generally to the Class, namely exposing them to the risk of disclosure of their confidential personal and medical information, so that final injunctive relief prohibiting Defendant from continuing its negligent practices is appropriate with respect to the Class as a whole; and

g.       A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.       Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional patients will be harmed, and Defendant will continue to retain its ill-gotten gains;

ii.      It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

iii.     When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the class;

iv.      A class action will permit an orderly and expeditious administration of Class claims and foster economies of time, effort, and expense;

v.       The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi.      Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

52.     Class certification, therefore, is appropriate pursuant to FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

53.     Class certification is also appropriate pursuant to FED. R. CIV. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and/or equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA CONFIDENTIALITY OF MED. INFORMATION ACT
### (Cal. Civ. Code § 56, *et seq.*)

54.     Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

55.     Defendant, a corporation organized for the primary purpose of maintaining medical information and whose principle place of business is in California and who maintained in California the confidential personal and medical information it collected from Plaintiffs and the Class, is subject to the requirements and mandates of the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et. seq.* ("CMIA").

56.     Sections 56.10 and 56.36 of the CMIA prohibit entities subject to the CMIA from disclosing and negligently releasing the confidential medical information of their patients without authorization.  Plaintiffs did not authorize the public disclosure or release of their confidential medical information.

57.     As a direct result of its negligent failure to adequately protect the data it collected from patients, Defendant likely disclosed and released the confidential personal and medical information of Plaintiffs and the Class to criminals.

58.     As alleged more fully above, following the September 23, 2012 theft of the Alere computer containing Plaintiffs' and the Class Members' CMI, including Ms. Fertig and Mr. Ingargiola's confidential and personal medical information, Ms. Fertig and Mr. Ingargiola were subject to identity theft and the wrongful use and control of their personal and confidential

information.  This identity theft and wrongful use of their personal and confidential information was likely a direct result of the wrongful disclosure by Defendant.

59.     Indeed, within weeks to months of the wrongful disclosure, thieves utilized Ms. Fertig and Mr. Ingargiola's CMI to open fraudulent accounts in their names.

60.     In order to open these accounts, thieves required Ms. Fertig and Mr. Ingargiola's social security numbers and full names.  This type of personal and confidential information was entrusted by Ms. Fertig and Mr. Ingargiola to Defendant's care.

61.     Moreover, prior to Defendant's wrongful disclosure, neither Ms. Fertig nor Mr. Ingargiola ever experienced any form of identity theft or otherwise wrongful disclosure/use of their personal and confidential information.

62.     Furthermore, both Ms. Fertig and Mr. Ingargiola exercised the utmost care in preserving the confidentiality of their personal information in order to prevent the wrongful use of same.

63.     By disclosing and releasing the private medical information of Plaintiffs and the Class without authorization, Defendant violated section 56, *et seq.* and Defendant's legal duty to protect the confidentiality of such information.

64.     Similarly, Defendant lawfully came into possession of Plaintiffs' and Class Members' medical information and had a duty pursuant to Sections 56.06 and 56.101 of the CMIA to maintain, store and dispose of Plaintiffs' and Class Members' medical records in a manner that preserved its confidentiality.  Sections 56.06 and 56.101 of the CMIA prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential medical information.

65.     Defendant further violated the CMIA by failing to use reasonable care, and, in fact, negligently maintained, Plaintiffs' and Class Members' medical information.

66.     Defendant violated the CMIA by negligently releasing Plaintiffs' confidential information and also by negligently maintaining that same information.

67.     As a direct and proximate result of Defendant's violations of the CMIA, Plaintiffs and Class Members have been injured within the meaning of the CMIA and are entitled to damages of $1,000 each pursuant to Cal. Civ. Code § 56.36(b)(1).

## SECOND CAUSE OF ACTION
### WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (15 U.S.C. § 1681, *et seq.*)

68.    Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

69.    The Fair Credit Reporting Act ("FCRA") requires consumer reporting agencies to adopt and maintain procedures for meeting the needs of commerce for consumer credit, personnel, insurance and other information in a manner fair and equitable to consumers while maintaining the confidentiality, accuracy, relevancy and proper utilization of such information.

70.    The FCRA defines a "consumer reporting agency" as:

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

71.    The FCRA defines a "consumer report" as:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes, employment purposes, or any other purpose authorized under [15 U.S.C. §] 1681(b).

15 U.S.C. § 1681a(d)(1).

72.    The FCRA defines "medical information" as:

> [I]nformation or data, whether oral or recorded, in any form or medium, created by or derived from a health care provider or the consumer, that relates to – (A) the past, present, or future physical, mental, or behavioral health or condition of an individual; (B) the provision of

health care to an individual; or (C) the payment for the provision of health care to an individual.

15 U.S.C. § 1681a(i).

73.     The FCRA specifically protects medical information, restricting its dissemination to limited instances. *See, e.g.,* 15 U.S.C. §§ 1681a(d)(3), 1681b(g), 1681c(a)(6).

74.     Alere is a Consumer Reporting Agency as defined under FCRA because for monetary fees, Alere regularly engages, in whole or in part, in the practice of assembling information on consumers for the purpose of furnishing Consumer Reports to third parties and/or uses interstate commerce for the purpose of preparing and/or furnishing Consumer Reports.  The CMI Alere collects plainly falls within "consumer credit information *or other information* on consumers," (emphasis added) and consumers are simply defined as "individual[s]." § 1681a(c).

75.     The confidential medical and personal files Alere maintains are consumer reports because they contain information bearing on a patient's personal characteristics and mode of living which is used or expected to be used or collected in whole or in part for the purpose of establishing the patient's insurance coverage.

76.     In fact, one of the services Alere offers is to "check with your insurance provider, and call you directly to give you the details on your coverage."[6]  Alere also boasts that "[o]ur industry-leading service program includes insurance coverage determination . . ."[7]

77.     Specifically, Defendant provides in home anticoagulation monitoring services and related products. ("Home INR Monitoring services and products").  Defendant's products and services are eligible for insurance coverage.  However, in order for a patient to receive insurance coverage, insurance providers require (1) an eligible diagnosis of Mechanical Heart Valve, Atrial

---

[6] http://www.alere.comius/en/health-solutions/home-monitoring/patients/how-to-get-started.html.

[7] http://www.alere.com/us/en/health-solutions/home-monitoring.html.

Fibrillation, Venous Thromboembolism, Deep Vein Thrombosis, Pulmonary Embolism or Hypercoagulable state; (2) the patient must meet certain criteria such as taking Coumadin medication or warfarin for at least 90 days; (3) a physician's prescription attesting to the medical necessity for Home INR Monitoring services and products and (4) a request submitted to the insurance provider for these products and services which is subject to the provider's approval or denial for coverage.[8]

78.    Defendant plays a critical and indispensable role in the determination and establishment of a potential client's insurance coverage for Defendant's Home INR Monitoring services and products.

79.    Defendant has boasted that, "Alere has helped over 10,000 physicians provide Home INR Monitoring services to over 75,000 patients."[9]

80.    Indeed, Defendant offers to communicate directly with a potential client's physician to provide information regarding Alere's product and services.  Defendant further offers an "Alere Physician Prescription Form" which a potential client's physician must complete and submit to the insurance provider for a coverage determination.[10]  Significantly, certain private insurance providers require that the physician participate in the development of the plan of care and "review of data collected in the home health agency's patient assessment in addition to signed order" in order for products and services such as Defendant's to be covered.[11]

---

[8] http://www.alerecoag.com/ww/pat/alere-home-inr-monitoring/frequently-asked-questions.html.

[9] http://www.alerecoag.com/ww/pat/alere-home-inr-monitoring/frequently-asked-questions.html.

[10] http://www.alerecoag.com/ww/pat/alere-home-inr-monitoring/frequently-asked-questions.html.

[11] https://www.unitedhealthcareonline.com/ccmcontent/ProviderII/UHC/en-US/Assets/ProviderStaticFiles/ProviderStaticFilesPdf/Tools%20and%20Resources/Policies%20and%20Protocols/Medical%20Policies/Medical%20Policies/CustodialandSkilled_CD.pdf

81.     Most critically, Defendant serves as the liaison between a potential client and their insurance provider for the determination and establishment of insurance coverage for Defendant's Home INR Monitoring services and products.

82.     Specifically, a potential client completes an application for Defendant in which the client provides personal confidential information, including their insurance information.  Thereafter, Defendant submits this application, a description of Defendant's products and services, the physician's prescription, and any other documents and/or information required for a coverage determination to the insurance provider.  Defendant also submits the request for approval of insurance coverage for their products and services to the provider.

83.     Defendant remains in contact with the insurance provider throughout the coverage determination process.  Furthermore, Defendant aids the insurance provider in rendering the coverage determination.  For example, should the insurance provider require any further documentation and/or information from the client, the insurance provider communicates this request to Defendant, Defendant relays such request to the client, Defendant collects such documentation and/or information from the client and returns this documentation and/or information to the insurance provider.

84.     Based upon the information and documentation provided by Defendant, a potential client's insurance provider will approve or deny coverage for Defendant's products and services.

85.     Defendant informs the potential client of their provider's coverage determination.  Consequently, the information provided by Defendant to the insurance provider is necessary to establish a coverage determination for Defendant's Home INR Monitoring services and products.

86.     As a Consumer Reporting Agency, Alere was (and continues to be) required to adopt and maintain processes, controls, policies, procedures and/or protocols to safeguard, protect and limit the dissemination of consumer credit, personal, insurance, and other information (such as Plaintiffs' and Class Members' confidential personal and medical information) in a manner fair and equitable to

consumers while maintaining the confidentiality, accuracy, relevancy and proper utilization of such information. Alere, however, violated the FCRA by failing to adopt and maintain such protective procedures which, in turn, directly and/or proximately resulted in the wrongful dissemination of Plaintiffs' and Class Members' confidential personal and medical information into the public domain.

87.    Plaintiffs' and Class Members' confidential personal and medical information, in whole and/or in part, constitutes medical information as defined under FCRA. Alere also violated the FCRA by failing to specifically safeguard, protect and limit the dissemination of Plaintiffs' and Class Members' confidential medical information into the public domain.

88.    Alere's repeated violations of FCRA – including its failure to encrypt and password protect the laptop containing the confidential personal and medical information of 116,000 people – as set forth above, were willful or, at the very least, reckless.

89.    As a direct and/or proximate result of Alere's willful violations of FCRA, as described above, Plaintiffs' and Class Members' personal medical information was disclosed and made accessible to unauthorized third parties in the public domain.

90.    As a further direct and/or proximate result of Alere's willful violations of FCRA, as described above, Plaintiffs and Class Members suffered actual damages in the form of, *inter alia*, the expense of securing credit reports, internet and/or credit monitoring services and insurance, loss in the value of their confidential personal and medical information, out-of-pocket expenses, loss of privacy, and other economic harm.

91.    Plaintiffs and Class Members, therefore, are entitled to compensation for their actual damages or statutory damages ranging from $100 to $1000, per Class Member, as well as their attorneys' fees, litigation expenses, and costs, pursuant to 15 U.S.C §1681n(a).

### THIRD CAUSE OF ACTION
### NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (15 U.S.C. § 1681, *et seq.*)

92.     Plaintiffs and the Class re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

93.     In the alternative to Count IV, and as described above, Alere negligently violated FCRA by failing to design, adopt, implement, control, direct, oversee manage, monitor and/or audit the appropriate processes, controls, policies, procedures and/or protocols to safeguard, protect and limit the dissemination of consumer credit, personnel, medical, and other information (such as Plaintiffs' and Class Members' confidential personal and medical information) for the permissible purposes outlined by FCRA which, in turn, directly and/or proximately resulted in the Data Breach and wrongful dissemination of Plaintiffs' and Class Member's confidential and personal medical information into the public domain.

94.     It was reasonably foreseeable that Alere's failure to design, adopt, implement, control, direct, oversee manage, monitor and/or audit the appropriate processes, controls, policies, procedures and/or protocols to safeguard, protect and limit the dissemination of Plaintiffs' and Class Members' confidential personal and medical information would result in an unauthorized third party gaining access to their confidential personal and medical information for no permissible purpose under FCRA.

95.     As a direct and/or proximate result of Alere's negligent violations of FCRA, as described above, Plaintiffs' and Class Members' confidential personal and medical information was stolen and made accessible to unauthorized third parties in the public domain.

96.     As a further direct and/or proximate result of Alere's negligent violations of FCRA, as described above, Plaintiffs and Class Members suffer (and continue to suffer) damages in the form of, *inter alia*, the expense of securing credit reports, internet and/or credit monitoring services and insurance, loss in the value of their confidential personal and medical information, out-of-pocket

expenses, loss of privacy, and other economic harm.  Alere's negligent wrongful actions and/or inaction violated FCRA.

97.     Plaintiffs and Class Members, therefore, are entitled to compensation for their above actual damages, as well as their attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. §1681o(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

1.     For an Order certifying the proposed Class pursuant to FED. R. CIV. P. 23(b)(2) and/or (3), requiring notice thereto to be paid by Defendant and appointing Plaintiffs and their counsel to represent the Class;

2.     For appropriate injunctive relief and/or declaratory relief, including an order requiring Defendant to immediately secure and fully encrypt all confidential information, to store any computer passwords in a location separate from the computers, to properly secure computers containing confidential information, to cease negligently storing, handling, and securing its patients' confidential information, to notify patients whose medical information is wrongly disclosed in an expedient and timely manner and to provide identity theft monitoring for an additional five years;

3.     Adjudging and decreeing that Defendant has engaged in the conduct alleged herein;

4.     For compensatory and general damages according to proof on certain causes of action;

5.     For damages on certain causes of action, including $1,000 per Class Member;

6.     For reimbursement, restitution and disgorgement on certain causes of action;

7.     For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

8.     For costs of the proceedings herein;

9.     For reasonable attorneys' fees as allowed by statute; and

10.     For any and all such other and further relief that this Court may deem just and proper, including but not limited to punitive or exemplary damages.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury of all claims and causes of action in this lawsuit.

DATED:  October 28, 2014

By:    /s/ Jeremiah Frei-Pearson_____
        Jeremiah Frei-Pearson (*Pro Hac Vice*)
        D. Greg Blankinship (*Pro Hac Vice*)
        **FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP.**
        1311 Mamaroneck Avenue
        White Plains, New York 10605
        Telephone:  (914) 298-3281
        Fax:  (914) 824-1561
        jfrei-pearson@fbfglaw.com
        gblankinship@fbfglaw.com

        ERIC A. GROVER (SBN 136080)
        eagrover@kellergrover.com
        CAREY G. BEEN (SBN 240996)
        cbeen@kellergrover.com
        **KELLER GROVER LLP**
        1965 Market Street
        San Francisco, California  94103
        Telephone:     (415) 543-1305
        Facsimile:     (415) 543-7861

        *Counsel for Plaintiffs and the Class*